**F I L E D**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

TRACY MOORE,

     Plaintiff - Appellant,

v.

MICHAEL GUTHRIE, individually
and in his official capacity as Chief of
Police of the City of Evans, Colorado;
CITY OF EVANS, COLORADO, a
municipal corporation,

     Defendants - Appellees.

No. 04-1435

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**(D.C. No. 03-M-2558 (OES))**

---

Michael T. Lowe (Marc F. Colin with him on the briefs) of Bruno, Bruno &
Colin, P.C., Denver Colorado, for Plaintiff-Appellant.

David R. DeMuro (Lana L. Steven with him on the brief) of Vaughan & DeMuro,
Denver, Colorado, for Defendants-Appellees.

---

Before **BRISCOE, McKAY**, and **EBEL**, Circuit Judges.

---

**McKAY**, Circuit Judge.

---

Plaintiff was injured when a bullet flew up beneath his police officer's "riot helmet" during an intense "live fire" training exercise with other police officers, causing him to lose fifty-seven percent of his vision in one eye. The injured officer is a member of the City of Evans, Colorado, police department. The exercise is part of the department's firearms training program, and it simulates various "live fire" scenarios, where officers switch off playing the roles of perpetrators and policemen. The training exercise is meant to replicate combat scenarios that a police officer might encounter on the street. What makes the exercise so realistic is the use of "Simunition," a highly-specialized live ammunition specifically designed to replace the standard live ammunition in police officers' personal service weapons. Simunition is available for both .38 calibers and nine-millimeters, utilizes smokeless gunpowder as a propellant, and fires a plastic, liquid-filled, bullet-shaped projectile which shatters on impact, marking the target with brightly-colored liquid. Because Simunition is intended as a combat training tool, Simunition cartridges are specifically designed to be painful to a person on impact; the Simunition manufacturer refers to this characteristic as "impact penalty." A Simunition projectile striking unprotected skin will leave bruises, welts, and abrasions.

Simunition's manufacturer has also developed a line of protective

equipment to be worn when training with Simunition rounds. This protective equipment includes a face mask which provides 360-degree head coverage and fits closely around the neck and chin without gaps; a throat collar; groin, torso, leg, and arm covers; and gloves. Three different firearms instructors, on three separate occasions, told Chief Guthrie that the manufacturer required its own face masks to be worn during exercises with Simunition rounds. Chief Guthrie did not authorize purchasing any of the protective equipment from Simunition's manufacturer. Instead, he authorized using "riot helmets" during the firearms training. Riot helmets cover the head above the neck, and incorporate a clear plastic shield which extends from the front of the helmet straight down in front of the wearer's face. But, riot helmets do not protect the neck or throat, and are positioned such that a gap of approximately three inches exists between the wearer's face and the plastic shield.

During an exercise which took place in a vacant lot, Plaintiff, wearing a riot helmet, was injured when a Simunition bullet flew up beneath his plastic shield and hit him in his right eye. He pursued two claims for relief in the district court: (1) a 42 U.S.C. § 1983 claim against the City of Evans for violation of his Fourteenth Amendment right to bodily integrity; and (2) a 42 U.S.C. § 1983 claim against Chief Guthrie individually for violation of this right. The district court dismissed Plaintiff's complaint for failure to state a claim for relief, specifically

that the facts he pleaded were insufficient to defeat a qualified immunity defense.

To survive a motion to dismiss for failure to state a claim, Plaintiff must allege facts sufficient to overcome qualified immunity. The first prong of an assertion to defeat a qualified immunity defense requires there to have been a violation of a clearly established constitutional right. *Siegert v. Gilley*, 500 U.S. 226, 231 (1991). The second is the requirement that the violated right was "clearly established" at the time of the alleged conduct. *Id*. at 232. The district court dismissed Plaintiff's complaint because the stated facts did not rise to the conscience-shocking level necessary to plead a constitutional violation and because Plaintiff had not demonstrated that the alleged constitutional violation was contrary to clearly established law. Plaintiff appeals this order of dismissal of his complaint.

Because the sufficiency of a complaint is a question of law, we review de novo the district court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), applying the same standards as the district court. *Sutton v. Utah State Sch. for Deaf and Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999). "That is, all well-pleaded factual allegations in the . . . complaint are accepted as true and viewed in the light most favorable to the nonmoving party." *Id*. It is true that dismissal under Rule 12(b)(6) "is a harsh remedy which must be cautiously studied, not only to effectuate the spirit of the liberal rules of pleading

-4-

but also to protect the interests of justice." *Duran v. Carris*, 238 F.3d 1268, 1270 (10th Cir. 2001) (quotation and citation omitted). It is also well established that dismissal of a complaint is proper only if "it appears to a certainty that plaintiff is entitled to no relief under any state of facts which could be proved in support of the claim." *Gas-A-Car, Inc. v. Am. Petrofina, Inc.*, 484 F.2d 1102, 1107 (10th Cir. 1973); *see also Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

Pleading his case that his constitutional rights were violated, Plaintiff claims "[i]t is beyond cavil that the Due Process Clause protects an individual's right to 'bodily integrity.'" Aplt. Br. at 13. But the Supreme Court has recognized a liberty interest in bodily integrity in only very limited circumstances involving such things as abortions, *Roe v. Wade*, 410 U.S. 113 (1973), end-of-life decisions, *Cruzan v. Dir., Missouri Dep't of Health*, 497 U.S. 261 (1990), birth control decisions, *Griswold v. Connecticut*, 381 U.S. 479 (1965), and instances where individuals are subject to dangerous or invasive procedures where their personal liberty is being restrained, *see, e.g.*, *Rochin v. California*, 342 U.S. 165 (1952) (determining that a detainee's bodily integrity was violated when police ordered doctors to pump his stomach to obtain evidence of drugs); *Screws v. United States*, 325 U.S. 91 (1945) (holding that an individual's bodily integrity was violated where a citizen was beaten to death while in police custody). Plaintiff argues that he has a cognizable claim for a violation of bodily integrity,

based on his alleged right to work in a safe environment.

The Supreme Court, however, has declined to extend due process protection to safe working conditions. In *Collins v. City of Harker Heights*, 503 U.S. 115, 126 (1992), the Court held that substantive due process was not a guarantor of workplace safety: "Neither the text nor the history of the Due Process Clause supports petitioner's claim that the governmental employer's duty to provide its employees with a safe working environment is a substantive component of the Due Process Clause." Although Plaintiff cannot be said to have a "right to bodily integrity in a safe work environment," out of an abundance of caution we will nevertheless review whether the complained-of conduct shocks the conscience.

Again, our first step, when faced with a claim of qualified immunity against § 1983 substantive due process claims, is to determine whether a plaintiff "has asserted a violation of a constitutional right at all." *Siegert*, 500 U.S. at 232. The "ultimate" standard for determining whether there has been a substantive due process violation is "whether the challenged government action shocks the conscience of federal judges." *Ruiz v. McDonnell*, 299 F.3d 1173, 1183 (10th Cir. 2002) (quotations and citations omitted). It is well settled that negligence is not sufficient to shock the conscience. *Id*. at 1184. In addition, "'a plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power.'" *Tonkovich v.*

*Kansas Bd. of Regents*, 159 F.3d 504, 528 (10th Cir. 1998) (quoting *Uhlrig v. Harder*, 64 F.3d 567, 574 (10th Cir. 1995)). "Even knowingly permitting unreasonable risks to continue does not necessarily rise to the level of conscience shocking." *DeAnzona v. City and County of Denver*, 222 F.3d 1229, 1235 (10th Cir. 2000).

Plaintiff argues that his eye injury enables him to claim that his right to bodily integrity was violated by Chief Guthrie's decision not to purchase the Simunition manufacturer's face mask and protective gear. The task at hand is to decide whether the district court properly dismissed his complaint for failure to state a claim–do we agree that Chief Guthrie's directive to wear riot helmets, rather than the Simunition face mask, was not conscience-shocking conduct?

Due process protection has "[h]istorically . . . been applied to *deliberate* decisions of government officials to deprive a person of life, liberty, or property." *Daniels v. Williams*, 474 U.S. 327, 331 (1986). In *Daniels*, the Court provided several examples of such conscience-shocking conduct, including: stomach pumping, *Rochin*, 342 U.S. at 165; paddling a student, *Ingraham v. Wright*, 430 U.S. 651 (1977); and the intentional destruction of an inmate's property, *Hudson v. Palmer*, 468 U.S. 517 (1984). In *Uhlrig*, we held that the mental health administrators' decision to place a criminally insane patient (who then murdered an employee) in a less-secure ward did not shock the conscience and provided

some additional guidance about the "shock the conscience" standard:

> [W]e must bear in mind three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

64 F.3d at 573 (citations omitted).

We shall not pause long over the first principle–restraint in defining the scope of due process violations–other than to refer to our aforementioned hesitancy to consider bodily integrity in the workplace a constitutional right.

The second principle, the concern that § 1983 not replace state tort law, is relevant to Plaintiff's case. His claim is similar to a state tort law cause of action–that the city breached its duty of care by failing to provide adequate safety equipment in the training exercise. In *Collins*, the Supreme Court held that the city's failure to train its employees about known workplace hazards was not conscience shocking and stated that "we have previously rejected claims that the Due Process Clause should be interpreted to impose federal duties that are analogous to those traditionally imposed by state tort law." 503 U.S. at 128 (citations omitted). The Court added that the characterization of state tort law claims as federal ones was of particular concern in cases against public employers, where state employment law would normally govern the terms of the relationship. *Id.* This is precisely the relationship between Plaintiff and Chief

Guthrie.

The third principle, the deference to local decision-makers, also pertains to Plaintiff's case. Plaintiff is asking us to play Monday-morning quarterback about a decision (providing riot helmets rather than more protective face gear) that seems, at most, negligent. This type of second-guessing "a rational decisionmaking process that takes account of competing social, political, and economic forces" is specifically cautioned against in *Collins*: "Decisions concerning the allocation of resources to individual programs . . . and to particular aspects of these programs . . . involve a host of policy choices that must be made by locally elected representatives, rather than by federal judges interpreting the basic charter of the Government for the entire country." *Id*. In instances where the behavior complained of seems more negligent than egregious or deliberate, we heed the Supreme Court's cautionary words and steer clear of territory of which we are not the best reviewers.[1]

---

[1] We reject Plaintiff's argument that a prolonged opportunity to deliberate should automatically be judged conscience-shocking behavior. While length of deliberation may be a factor in a conscience-shocking analysis, *see, e.g*, *County of Sacramento v. Lewis*, 523 U.S. 833, 853 (1998) ("When such extended opportunities to do better are teamed with protracted failure even to care, indifference is truly shocking."), it cannot replace the over-arching need for deference to local policy-making bodies. Were this not so and any long-deliberated decision (resulting in a later injury) were called conscience-shocking, substantive due process violations would become a substantial and unnecessary substitute to state tort law.

We acknowledge that the conscience-shocking standard is difficult to define and to pinpoint. In the past, we have required that the plaintiff demonstrate "a high level of outrageousness," and we have been reminded that "the Supreme Court has specifically admonished that a substantive due process violation requires more than an ordinary tort and that merely allowing unreasonable risks to persist in the workplace is not necessarily conscience shocking." *Uhlrig*, 64 F.3d at 574 (citing *Collins*, 503 U.S. at 128). While we do not wish to understate Plaintiff's injury, it was the result of allowing a risk, perhaps not even an unreasonable one, to persist in the workplace.

Plaintiff alternatively argues that he has sufficiently pleaded a violation of his right to bodily integrity under the "danger creation" theory. The danger creation theory is an exception to the rule that state actors are not liable for the violent acts of third parties. *See Christiansen v. City of Tulsa*, 332 F.3d 1270, 1279-80 (10th Cir. 2003). The danger creation doctrine makes a state official liable for the private violence of third parties if that official created the danger that caused the harm and the official's conduct was conscience shocking. *Id*. at 1281. We have identified the "classic" danger creation case to be *Wood v. Ostrander*, 879 F.2d 583 (9th Cir. 1989), where police officers impounded the plaintiff's car and abandoned her in the middle of the night in a high crime area where she was raped. *Uhlrig*, 64 F.3d at 572; *Sutton*, 173 F.3d 1238 n.12. This is

a narrow exception, *Gonzales v. City of Castle Rock*, 366 F.3d 1093, 1099 (10th Cir. 2004), which applies only when a state actor "affirmatively acts to create, or increases a plaintiff's vulnerability to, danger from private violence," *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001). It does not apply when the injury occurs due to the action of another state actor. In the instant case, since Plaintiff was injured by a Simunition bullet fired by a fellow police officer and not a private third party, the danger creation doctrine is inapplicable.

Plaintiff also contends that he has sufficiently pleaded a violation of his right to bodily integrity under the "special relationship" doctrine. The special relationship doctrine is another exception to the general principle that government actors are not responsible for private acts of violence. *Christiansen*, 332 F.3d at 1279-80. As just discussed, however, because this case does not involve a private act of violence by a third party, this theory is also inapplicable to the facts alleged by Plaintiff. More importantly, we have specifically held that the special relationship doctrine is not triggered in an employment relationship, which is presumed consensual. *See Liebson v. New Mexico Corrections Dep't*, 73 F.3d 274, 276 (10th Cir. 1996); *Uhlrig*, 64 F.3d at 572.

Last, it should be noted that, even if either the danger creation or special relationship theory were applicable, it would not relieve Plaintiff of his duty to allege actions that shock the conscience.

As required under the second prong to defeat a qualified immunity defense, Plaintiff argues that his violated right was clearly established at the time of his injury. We must determine whether his right to bodily integrity "had been clearly established so that a reasonable official in the defendant's situation would have understood that his conduct violated that right." *Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994). In order for a law to be clearly established, "'there must be a Supreme Court or other Tenth Circuit decision on point, or the clearly established weight of authority from other circuits must have found the law to be as the plaintiff maintains.'" *Murrell v. School Dist. No. 1*, 186 F.3d 1238, 1251 (10th Cir. 1999) (quoting *Medina v. City and County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992)).

Although Plaintiff does not need to find a case with an identical factual situation, he still must show legal authority which makes it "apparent" that "in the light of pre-existing law" a reasonable official, in Chief Guthrie's position, would have known that having police officers wear riot helmets rather than Simunition face masks would violate their substantive due process right of bodily integrity. *See Albright v. Rodriguez*, 51 F.3d 1531, 1534-35 (10th Cir. 1995) (citation and quotation omitted). First, as discussed earlier, the Supreme Court has only recognized a right to bodily integrity under the Fourteenth Amendment in very limited circumstances, not including working in a safe environment. Second,

courts have declined to find a violation of substantive due process in circumstances similar to, or more shocking than, that alleged by Plaintiff. Therefore, we cannot say that it was clearly established that Chief Guthrie and the City of Evans violated Plaintiff's constitutional right to bodily integrity by requiring him to wear his riot helmet during training.

We **AFFIRM** the decision of the district court.